248 N.J. Super. 285 (1991)
590 A.2d 1206
JOHNSON MACHINERY COMPANY, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
MANVILLE SALES CORPORATION, A DELAWARE CORPORATION, DEFENDANT-RESPONDENT, AND TICOR TITLE INSURANCE COMPANY, A CALIFORNIA CORPORATION, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 11, 1990.
Decided May 15, 1991.
*288 Before Judges KING, LONG and STERN.
William C. Slattery argued the cause for appellant (Norris, McLaughlin & Marcus, attorneys; William C. Slattery, of counsel and on the brief).
Kenneth H. Mack argued the cause for respondent (Picco Mack Kennedy Jaffe Perrella & Yoskin, attorneys; Kenneth H. Mack, of counsel; Burton J. Jaffe, on the brief).
Paul H. Schneider, Deputy Attorney General, argued the cause for amicus curiae, New Jersey Department of Environmental Protection (Robert J. Del Tufo, Attorney General, attorney; Michael R. Clancy, Assistant Attorney General, of counsel; Paul H. Schneider, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
In June 1989, plaintiff Johnson Machinery Company (Johnson) instituted this action against defendants Manville Sales Corporation (Manville) and Ticor Title Insurance Company (Ticor) *289 in the Superior Court, Chancery Division, to rescind a contract pursuant to which Manville had agreed to convey approximately 100 acres of land and improvements to Johnson; to obtain a return of the deposit of $2.2 million Johnson delivered to Ticor (the escrow agent) and for damages against Manville for fraud and negligent misrepresentation. Manville answered the amended complaint and counterclaimed for specific performance. The claims against Ticor were dismissed by consent.
In September 1989, Johnson moved for partial summary judgment pursuant to R. 4:46-2 on the fourth count of its amended complaint which alleged that it was entitled to void the contract because of Manville's noncompliance with the provisions of the Sanitary Landfill Facility Closure and Contingency Fund Act (Closure Act), N.J.S.A. 13:1E-100 to -116. Manville opposed the motion, claiming that the Closure Act does not apply to a sole source landfill (one which operates only as the depository of the waste its own commercial operation had generated) and that, in any event, genuine issues of material fact remained to be resolved, thus precluding summary judgment. The trial judge denied summary judgment on the grounds that the agreement was ambiguous as to the parties' intent and that a "quasi-factual" question remained as to "whether any portion of the site, admittedly designated by Manville as an inactive landfill, lies within the boundaries of the agreed-upon Sale Property." He also held that the "application of the Closure Act to the instant matter would not comport with the respective legislative intent, nor that Act's statutory scheme."
By leave granted, Johnson appeals claiming that the trial judge erred in denying summary judgment because the Closure Act applies to the contract property; the notice provisions of the Act (N.J.S.A. 13:1E-116) were violated by Manville; and the violation entitled it to void the agreement.
*290 At issue here is Section 116 of the Closure Act which provides:
a. No person shall contract to sell any land which has been utilized as a sanitary landfill facility at any time prior to the effective date of this supplementary act unless the contract of sale for the land shall state the fact and the period of time that the land was so utilized.
Any prospective purchaser of such land may obtain from the department, upon written request therefor, a history of the compliance by the facility with all applicable statutes, rules and regulations administered by the department.
b. Any contract made in violation of this section is voidable.[1]
We hold that the term "sanitary landfill facility" in the Closure Act includes a sole source landfill which operates only as the depository of the waste its own commercial operation has generated. We also hold that the Closure Act means exactly what it says: where sale property has been used as a sanitary landfill facility, the seller must include in the contract of sale a statement that the property has been so used and for what period of time. Failure to include this information will result in the contract being void at the sole discretion of the buyer. No equitable defenses to the voiding of the contract are recognized.

I
Manville is the owner of approximately 185 acres of real property and improvements located in the Borough of Manville, *291 Somerset County, New Jersey. The property was part of an asbestos-using manufacturing facility operated by Manville from about 1912 to 1985. In 1985, Manville announced its decision to cease manufacturing at the property. Because Manville was an "industrial establishment" within the meaning of N.J.S.A. 13:1K-8(f), the closing of the plant triggered its filing obligation under the New Jersey Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 to -13 (ECRA). The first of these filings was Manville's ECRA Site Evaluation Submission (SES) of September 9, 1985 which described the history of the manufacture, use, disposal, and handling of hazardous substances and wastes at the property. This filing, which indicated that there are approximately 2.1 million square feet of improvements on the land, included an appendix (Appendix 9) which described the location of hazardous substances on the property, and a map (# X-5320-2) which revealed an "inactive landfill" on several parts of the property. The landfill depicted on this map was, according to Manville, composed of "solid industrial wastes such as: lime, asbestos, asphalt roofing, transite pipe, etc." Appendix 10 to the SES described Manville's landfill operations:
A company-owned solid waste landfill, 198 acres in area, is located along Dukes Parkway, approximately one-half mile from the plant. The landfill has been used for the disposal of manufacturing waste from the plant since the early 50's....
....
Prior to the early 50's, manufacturing waste was deposited in landfill areas, now inactive, located in the northern section of the main plant site. This area is indicated on Print X-5320-2. [Emphasis added].
Appendix 15 to the SES which set forth Manville's plan for decontamination of its buildings and equipment stated:
As indicated on Print X-5320-2, a portion of the Manville Plant was used as an industrial landfill prior to the purchase of the land along Dukes Parkway, and its subsequent use for landfill purposes in the 1950's. The inactive landfill at the site of the plant contains asbestos and other materials which were used in production operations at that time. [Emphasis added].
The SES was signed and certified by Manville's Plant Engineer.
In July 1986, Manville filed a Sampling Plan with the New Jersey Department of Environmental Protection (DEP) as required *292 by N.J.A.C. 7:26B-3.2(c)11. The Sampling Plan was prepared by Manville's environmental consultant, Elson T. Killam Associates, Inc. (Killam) and provided:
Prior to the early 50's, manufacturing waste products were deposited in an on-site landfill area which is now inactive. This landfill was located in the northern section of the main plant site.
This landfill will not be considered at this point within the sampling plan. Data concerning the history and operation of the landfill as well as its composition and extent is currently being reviewed. It is anticipated that these data will be sufficient to adequately define the extent and describe the composition of the landfill. Upon completion of this review, the results (including a map of this area) will be submitted to the DEP  Bureau of Industrial Site Evaluation.
In early 1987, Johnson and Manville began negotiations toward an agreement whereby Johnson would purchase a substantial portion of the Manville property. Throughout the negotiations, a distinction was made between the portion of the property that Johnson would purchase (Sale Property) and the portion of the property that Manville would retain (Retained Property). Correspondence from Manville to Johnson indicated the basis for the distinction:
The property we have decided to sell is a portion of the Manville, New Jersey plant facility.... The site is approximately 100 acres with about 1.7 million square feet of buildings. It does not include the rear portion of the site which contains extensive tailing ponds and asbestos waste deposits or the river flood plain portion of the site for obvious reasons.
During negotiations, Manville provided Johnson with a copy of the ECRA map (# X-5230-2). However, omitted from this copy was the "inactive landfill" designation which appeared on the map filed with the DEP.
The parties executed the final agreement in October 1987. Section 1.01 of the agreement defined the portion of the property which Manville agreed to sell and Johnson agreed to purchase as follows:
1.01 Purchase of the Sale Property.

(a) Subject to the terms and conditions provided herein, at closing, as that term is defined below, Manville shall convey to Johnson good and marketable title to approximately one hundred (100) acres of real property with approximately 1.7 million square feet of improvements thereon located in Manville, New Jersey, which real property is generally depicted on the attached Exhibit *293 A (the "Sale Property"). The precise boundaries of the Sale Property and the property to be retained by Manville and identified on Exhibit A as the "Retained Property" shall be established after Manville has determined (through soil sample tests, consultation with government representatives and other necessary or advisable steps) the extent to which said real property can be rehabilitated for future use pursuant to a program to be undertaken by Manville, as described in Section 5.02. In the event the Sale Property is determined to consist of less than 90 acres or more than 110 acres, the purchase price shall be adjusted at a rate of $100,000 per acre according to actual square footage purchased under 90 acres or over 110 acres. The boundary line of the Sale Property shall include such acreage as may be necessary to assure adequate turning ratios along the northern boundary of the Sale Property. The boundary line to the Sale Property shall be determined after Manville has consulted with Johnson, which boundary line shall include within the Sale Property all buildings composing the approximately 1.7 million square feet of improvements currently thereon.
Sections 5.01(b) and 5.02 of the agreement described the condition of the Sale Property:
(b) Except as expressly provided herein and in Section 1.03 as to title and Section 5.02 as to the completion of the Rehabilitation Program THE PROPERTY SHALL BE SOLD TO AND ACCEPTED BY JOHNSON "AS IS" WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED FOR ANY PURPOSE WHATSOEVER, INCLUDING IMPLIED WARRANTIES OF HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. Manville shall not be bound by or liable for any statements, promises or information relating to the Property made or furnished at any time by any employee, or agent of Manville. Further, Johnson agrees that once Manville has completed the rehabilitation work as provided in Section 5.02, and this transaction has been consummated, Manville shall have no further obligation or liability under any circumstances to Johnson for the condition of the Sale Property, whether such pertains to the asbestos content or any other matter affecting the Sale Property, and Johnson shall comply with all applicable laws, rules and regulations of local, state, federal or other jurisdictions in connection with its use and development of the Sale Property and the Option Property.
5.02 Compliance with Environmental Laws.

The Sale Property and certain surrounding property owned by Manville contains residue of asbestos and asbestos-containing products. Manville has initiated discussions with the New Jersey Department of Environmental Protection (DEP) to remove or contain the asbestos and any other contaminants on the Sale Property to permit the conveyance of the Sale Property to Johnson. Manville shall complete the rehabilitation of the Sale Property in accordance with the requirements of an approved clean-up plan by the DEP and the requirements of the Environmental Cleanup and Responsibility Act of the State of New Jersey ("ECRA") or receive an Administrative Consent Order from DEP permitting the conveyance of the Sale Property hereunder *294 to Johnson (sometimes the "Rehabilitation Program"). Manville shall provide Johnson with copies of its filings with the DEP in relation to the Rehabilitation Program. Prior to closing Manville shall comply with applicable environmental laws in relation to the transformers and generators located on the Sale Property.
Further, the agreement contained the following pertinent section:
5.04 Sophisticated Purchaser.

Johnson hereby expressly represents and covenants that (a) it is a sophisticated purchaser having experience in the conduct of real estate developments, (b) Johnson or its agents shall, on the closing date, have reviewed all pertinent laws, ordinances, regulations and court orders pertaining to the Sale Property and shall have exercised due diligence in conducting an examination of the Sale Property, and (c) it has not relied on any representation or warranty by Manville, its agents, officers or employees in entering into this Agreement except as may be expressly stated or provided herein.
Killam submitted the Summary of Sampling Results and Environmental Site Assessment to DEP in April 1988. This report stated:
In addition to the native soil present, varying compositions and thicknesses of fill material were determined to exist on-site. Delineation of the extent of the fill material can be seen by correlating the drilling logs ... to their locations on the sampling point locations map.... As depicted by this comparison, it appears that fill material is generally pervasive throughout the site except for the southwest quadrant.
In November 1988, Killam submitted a Cleanup Plan Proposal for the Sale Portion. In this report, Killam stated:
This cleanup plan submittal, as agreed upon by the Manville Sales Corporation and the DEP, will focus on the sale portion of the property which consists of all former manufacturing areas.... For the purpose of remediating the site to a practicable and acceptable level of compliance, certain deed restrictions may apply to the subsequent uses of this site. If necessary, these deed restrictions will be included in the contract of sale, and will recognize the presence of asbestos containing material (ACM) at the site. Manville is currently awaiting the receipt of specific language from the DEP which details this site use constraint.
In addition, Killam addressed the distinction between the Sale Property and the Retained Property:
It was agreed by DEP and Manville Sales Corporation that the proposed cleanup plan for the entire 185-acre site would be divided into two separate submissions. The first submission which is the bulk of this report includes the entire manufacturing facility and excludes the former on-site landfill and the basin systems; the second submission will focus [on] remediation of the latter.
*295 Killam acknowledged that, because of the landfill, certain portions of the Sale Property would require remedial action and their use should be permanently restricted:
Soil samples from borings B-16 and B-17 also exhibited elevated concentrations of PHC and specific metals (i.e., antimony, copper, thallium and zinc). As noted throughout the site the metals appear to be directly related to fill material, which includes ACM. Based on these findings, it is being proposed that the surrounding asphalt cap be extended to include these areas, as excavation is not recommended due to the presence of ACM in the fill material.
To ensure the containment of waste materials and ACM in the former on-site landfill, all areas within the sale property which are known to be underlain by landfill waste will be paved. That is, pavement will be extended over existing unpaved areas within the landfill portion of the sale property. This is to be done as a component of the sale property cleanup plan.
....
In addition to the cleanup steps outlined in the preceding section, several other areas will also receive an asphalt cap. The areas in the sale portion of the property shown (via soil boring logs) to contain ACM will be paved and deed restrictions will be included in the sale contract to minimize the risk of subsurface intrusions and contact with any landfill material. These areas are depicted on the Site Map in Appendix A and fall within the boundary of the former on-site landfill (denoted by the topography line running through the property). It is estimated that the total area which will receive an extended asphalt cap encompasses 5.9 acres.
According to the site map, the areas of the Sale Property situated on the landfill include the warehouse; buildings RW, F, H, and I; and the area to the north of building G.
On May 30, 1989, DEP approved Manville's Cleanup Plan for the Retained Portion. This approval did not require Manville to remove the fill under any of the buildings. The only relevant condition incorporated was in reference to the Retained Property:
As previously discussed and agreed between the Department and Johns-Manville, a restriction shall be incorporated in the deed for the property. Disruption of these areas (retained portion) of the site must be eliminated as well as restrictions for use of this area of the facility must be incorporated. Johns-Manville shall submit a draft of the deed restriction to the Department for approval prior to incorporation into the deed.
On May 31, 1989, Dale D. Wheeler, Manville's Vice President, and other Manville representatives met with Mayer A. Rubenstein, Johnson's principal, and other Johnson representatives. *296 In a certification in opposition to the motion for summary judgment, Wheeler stated:
During our negotiations, Mr. Rubenstein expressed a desire to purchase all of the buildings on the Plant Property which, as I had mentioned to him, contained approximately 2 million square feet. Manville was unwilling to commit to sell Rubenstein all of the buildings prior to final approval of its cleanup plan because it wanted to retain flexibility with respect to cleanup and remediation which would be mandated by DEP under ECRA. Accordingly, Manville and Rubenstein agreed that approximately 1.7 million square feet of buildings would be included in the sale. Consequently, the location of the line demarcating what is defined in the Sales Agreement as "Sale Property" and "Retained Property" was drawn merely to indicate that the approximately 1.7 million square feet of buildings were included within the proposed boundaries of the Sale Property.
....
On May 31, 1989, I met with Mr. Rubenstein, other Manville representatives and other representatives of plaintiff. We discussed the fact that relatively minor portions of a few of the buildings included within the approximately 1.7 million square feet of space which Manville agreed to sell to Rubenstein were located on fill containing deposited waste material. I told Mr. Rubenstein that Manville could convey buildings containing approximately 1.7 million square feet as provided in the Sales Agreement since DEP was not requiring the removal of such fill.
In his deposition testimony, Rubenstein acknowledged that the amount of building space "could have been" 2.1 million square feet. Rubenstein claimed that the May 31 meeting was the first time that Manville informed Johnson that the inactive landfill underlay the Sale Property. Johnson terminated the agreement on June 7, 1989. This action ensued.

II
We turn first to the scope of the Closure Act which must be interpreted in light of the Solid Waste Management Act, N.J.S.A. 13:1E-1 to -37 (SWMA), of which it is a part. The SWMA was enacted to provide a comprehensive "statutory framework within which all solid waste collection, disposal and utilization activity in this State may be coordinated." N.J.S.A. 13:1E-2b(1). It defines the operative terms in the Closure Act as follows. A "sanitary landfill facility" is:

*297 [A] solid waste facility at which solid waste is deposited on or in the land as fill for the purpose of permanent disposal or storage for a period exceeding six months, except that it shall not include any waste facility approved for disposal of hazardous waste. [N.J.S.A. 13:1E-3q].
A "solid waste" facility is defined as:
[T]he plants, structures and other real and personal property acquired, constructed or operated or to be acquired, constructed or operated by any person pursuant to the provisions of this or any other act, including transfer stations, incinerators, resource recovery facilities, sanitary landfill facilities or other plants for the disposal of solid waste, and all vehicles, equipment and other real and personal property and rights therein and appurtenances necessary or useful and convenient for the collection or disposal of solid waste in a sanitary manner. [N.J.S.A. 13:1E-3h].
The term "solid waste" is described as follows:
[G]arbage, refuse, and other discarded materials resulting from industrial, commercial and agricultural operations, and from domestic and community activities, and shall include all other waste materials.... [N.J.S.A. 13:1E-3a].
Manville does not contend that the waste deposited at its site, which waste was the refuse of its industrial operation, is not solid waste as described in the SWMA. Rather, it is Manville's position that Manville is not a "solid waste facility" as described in N.J.S.A. 13:1E-3h because it is not a commercial facility; that is, in Manville's words, it is not primarily "operated for the disposal of solid waste from off-site sources." The argument follows that Manville cannot be a "sanitary landfill facility" because that term, as defined in N.J.S.A. 13:1E-3q, requires that the entity in question be a "solid waste facility."
Nothing in our research suggests that the commercial/sole source distinction advanced by Manville was ever contemplated by the Legislature. The SWMA was enacted to regulate "all solid waste ... disposal ... activity in this State ...," N.J.S.A. 13:1E-2b(1), and includes within its scope "all persons engaged in the ... disposal of solid waste in this State...." N.J.S.A. 13:1E-2b(6). Nothing in the previously cited definitions suggests to us that sole source landfills were meant to fall outside the broad reach of the SWMA. Indeed, the SWMA regulations enacted by DEP have long-established that intra-plant land disposal of solid waste is not exempt from the Act. The SWMA expressly empowers DEP to prescribe exemptions from its *298 coverage. N.J.S.A. 13:1E-4a. "Unless exempted ..., no person shall hereafter engage or continue to engage in the ... disposal of solid waste in this State without first filing a registration statement and obtaining approval thereof from the department." N.J.S.A. 13:1E-5a (emphasis added). SWMA exceptions were first provided for by DEP in 1974 by regulation. See 5 N.J.R. 369(b) (Nov. 8, 1973); 6 N.J.R. 305(c) (Aug. 8, 1974); R. 1974 d. 172 (eff. July 1, 1974). The agency's first solid waste regulation, N.J.A.C. 7:26-1.1, stated that:
[T]he following ... rules ... shall govern registration, operation and maintenance of landfill operations in the State of New Jersey.... These rules shall not apply to:
....
-1.1.5 The intra-plant transport, temporary storage or other handling of plant generated waste materials. Specifically not exempt are those materials to be, or which are, deposited on or in the lands of this State for periods exceeding six months, or which through transport, storage or other handling ... may pose a substantial or material threat to the public health, safety or welfare.
The original text of N.J.A.C. 7:26-1.1.5, now designated N.J.A.C. 7:26-1.1(a)5, has remained unchanged for over 16 years except that the chapter now applies not only to the registration and operation of sanitary landfills but to closure as well. See N.J.A.C. 7:26-1.1(a). Thus, from the inception of its regulatory jurisdiction, DEP treated the "intra-plant" land disposal of "plant generated waste materials" as a "sanitary landfill" subject to the "registration, operation and closure maintenance" requirements of the SWMA and the agency's implementing regulations.
Moreover, we note that since 1976, on several occasions, the Legislature has had an opportunity to address the sole source/commercial distinction and has taken pains to exempt non-commercial landfills, including on-site industrial landfills, from particular provisions of the SWMA. For example, by Chapter 93 of the Laws of 1983, N.J.S.A. 13:1E-117 to -122, the Legislature amended the SWMA to require solid waste facilities to install and use scales to determine the gross and net tare weight of vehicles disposing of solid waste. It expressly excepted from the scale requirement those solid waste facilities *299 that were "privately-owned, noncommercial, on-site industrial solid waste facilities which do not accept solid waste generated from any other source...." N.J.S.A. 13:1E-117. This is the precise definition of the Manville site which Manville urges is already exempt from all aspects of the SWMA. If this were correct, the scale requirement would not have applied in the first instance and the legislative exception would have been unnecessary. See also N.J.S.A. 13:1E-38(f), -39 (defining and prohibiting activities of "commercial solid waste facilities" near river flood hazard areas); N.J.S.A. 13:1E-57, -60e (hazardous waste facility siting criteria and registration requirements); N.J.S.A. 13:1E-127g(2) (filing of disclosure statements) as instances where the Legislature has specified exemptions for noncommercial landfills.
Thus, the Legislature has expressed its view of the SWMA legislation as generally including sole source landfills and its approval of the long-standing DEP interpretation to that effect. By not expressing a contrary view which it was clearly called upon to do in enacting SWMA exceptions, it can be inferred that the Legislature is satisfied that DEP's reading of the SWMA is correct. See GATX Terminals Corp. v. New Jersey Dep't of Envtl. Protection, 86 N.J. 46, 53, 429 A.2d 355 (1981); Matawan Borough v. Monmouth County Tax Bd., 51 N.J. 291, 300, 240 A.2d 8 (1968).
Nothing in the Closure Act supports a different view. As part of the SWMA and incorporating the definitions of that Act, the Closure Act has the same broad scope. Indeed, the expansiveness of the agenda informing the Closure Act is evidenced by the legislative findings supporting it:
[t]he proper closure of sanitary landfills is essential to the public health, safety and welfare; that closure activities can require capital expenditures at a time when revenues collected by sanitary landfill facilities are minimal or non-existent; and that it is necessary to guarantee that adequate funds are reserved to insure such closure.
... the improper operation or closure of sanitary landfill facilities can result in the contamination of surface and ground waters, including potable water supplies; that the migration of methane gas from sanitary landfill facilities *300 poses a significant threat to life and property; that compensation for the damage resulting from improper operation or closure is, at best, inadequate; and that it is necessary to provide a mechanism for the prompt and adequate compensation for these damages. [N.J.S.A. 13:1E-101].
Accordingly, the Closure Act imposes upon every owner or operator of a sanitary landfill facility the responsibility for proper closure:
Every owner or operator of a sanitary landfill facility shall be jointly and severally liable for the proper operation and closure of the facility, as required by law, and for any damages, no matter by whom sustained, proximately resulting from the operations or closure. [N.J.S.A. 13:1E-103].
In furtherance of its aims, the Closure Act establishes the Sanitary Landfill Facility Contingency Fund (Fund), N.J.S.A. 13:1E-105, and makes the Fund "strictly liable for all direct and indirect damages, no matter by whom sustained, proximately resulting from the operations or closure of any sanitary landfill." N.J.S.A. 13:1E-106. The Fund is administered by the DEP and is supported by revenues from a tax imposed on the yards of solid waste and gallonage of liquids accepted for disposal. N.J.S.A. 13:1E-104. Section 109 of the Closure Act also requires each owner or operator of a sanitary landfill facility to deposit a monthly amount (calculated based on the amount of solid waste accepted for disposal) in an escrow account for the closure of such a facility. N.J.S.A. 13:1E-109. While the tax and escrow provisions apply to sanitary landfill facilities in operation after January 1, 1982 (the effective date of the Act), the Closure Act also addresses land which was utilized as a sanitary landfill prior to January 1, 1982. This was recently confirmed in Vi-Concrete v. State, Dep't of Envtl. Protection, 115 N.J. 1, 556 A.2d 761 (1989), where the Supreme Court recognized the obligation of owners of operating landfills to contribute to the Fund and the obligation of the Fund to pay costs resulting from the improper closure of any landfill including one closed prior to the date of the Act. The Court held that if it is determined that a closed landfill is actively discharging pollutants, the Fund established by the Closure Act is authorized to pay the costs of the installation and maintenance of monitoring wells:

*301 The Closure Act ... reflects the Legislature's awareness that landfills closed prior to the effective date of the Closure Act and its implementing regulations "can result in the contamination of surface and ground waters, including potable water supplies," making it "necessary to provide a mechanism for the prompt and adequate compensation for these damages." N.J.S.A. 13:1E-101. Thus, the Fund established by the Closure Act is specifically authorized to pay costs resulting from the improper closure of any landfill, including the cost of installing and maintaining monitoring wells. N.J.S.A. 13:1E-106. The Fund's revenues are derived from the taxes levied on all operating landfills, reflecting a legislative purpose to impose on the landfill industry the financial burden of remediating damages caused by improperly closed landfills.

Id. at 14-15, 556 A.2d 761 (emphasis added).
Contrary to Manville's contention, the use of the term "landfill industry" in Vi-Concrete does not suggest that a noncommercial sole source landfill such as that of Manville was not contemplated when the statute was enacted. In context, it is clear that that term was meant to distinguish those operating sanitary landfill facilities which contribute to the Fund from those landfills which are covered by the Fund but which closed prior to the enactment of the Closure Act, and did not contribute. In short, nothing in the technical language of the Closure Act or Vi-Concrete suggests the existence of an exception for noncommercial sole source landfills.
As an alternative basis for the conclusion that the Closure Act is inapplicable to the Manville site, the trial judge cited regulations promulgated by DEP which implement the Closure Act, i.e., claims for compensation from the Contingency Fund, established by N.J.S.A. 13:1E-104 to -108. See N.J.A.C. 7:1I-1.1 to -6.3; 20 N.J.R. 443 (March 7, 1988); 20 N.J.R. 1732(b) (July 18, 1988). The definition of "sanitary landfill" in those regulations refers to "a facility which is, or at one time was, governmentally approved...." N.J.A.C. 7:1I-1.5. The trial judge concluded that because Manville was never licensed by the State as a sanitary landfill, it was not "governmentally approved" and was, therefore, not a "sanitary landfill" within the meaning of the Closure Act. Clearly, however, as the trial judge acknowledged, the DEP commentary in the New Jersey Register published simultaneously with promulgation of this *302 regulation specifically declared that the "governmental approval" language applies to any site that was "in some way regulated by some governmental entity." 20 N.J.R. 1732(b), 1733 (July 18, 1988). This broad description reflects the distinction between a legitimate operation such as that of Manville and the so-called "midnight dumping" site where hazardous waste is dumped by unknown entities from whom the Contingency Fund cannot seek reimbursement. N.J.S.A. 13:1E-103, -111. The trial judge simply overread N.J.A.C. 7:1I-1.5 and came to the unwarranted conclusion that because Manville ceased operating prior to the enactment of our modern environmental statutes and thus was not specifically licensed as a sanitary landfill facility, it falls outside the Closure Act. This reading of the rule is unsupportable.
Most important to us in interpreting the statutes in this case is the rule of reason. In enacting the Closure Act, the Legislature took note of the serious environmental problems flowing from improper closure: among these are "contamination of surface and ground waters including potable water supplies" and "the migration of methane gas ... [which] poses a significant threat to life and property...." N.J.S.A. 13:1E-101. In terms of these kinds of considerations, there is simply no basis to distinguish between sole source and ordinary commercial landfills. All landfills present an identical danger to the environment. That danger is not diminished because the solid waste comes from one source instead of many and there is no policy reason that we can discern why a sole source noncommercial industrial landfill should not be closed in the same environmentally sound manner as is prescribed for all other landfills. Likewise, we see no reason why the operator of such a landfill should not be required to set aside funds for such closure and as compensation for innocent victims. In the absence of clear legislative direction to the contrary, there is no reason to exempt sole source noncommercial landfills from the operation of the Closure Act. Accordingly, we hold that the *303 Closure Act generally applies to a sole source landfill like the Manville site.

III
We turn next to Manville's argument that Section 116 is a full disclosure statute which can be satisfied even if the contract of sale does not contain the words "sanitary landfill facility" and the amount of time the premises has been so used. According to Manville:
Johnson seeks to elevate the language of Section 116 to an incantation. However, Section 116 does not require regurgitation of its own words in a contract for the contract to satisfy the disclosure purpose of the statute. Importantly, our courts have held that where a literal reading will lead to a result not in accord with the essential purpose and design of an act, the spirit of the law will control over the letter of the law. New Jersey Turnpike Employees v. New Jersey Turnpike Auth., 200 N.J. Super. 48, 53 [490 A.2d 338] (App.Div. 1985), certif. denied, 101 N.J. 294 [501 A.2d 954] (1985). In other words, primary regard is to be given to the fundamental purpose for which the legislation was enacted, New Jersey Builders, Owners and Managers Ass'n v. Blair, 60 N.J. 330, 338 [288 A.2d 855] (1972), and, therefore, first attention must go to the purpose of the legislation even as against a literal reading. Continental Cas. Co. v. Knuckles, 142 N.J. Super. 162 [361 A.2d 44] (App.Div. 1976). To interpret Section 116 as requiring disclosure language which is substantially similar or identical to the language of the statute thereby permitting the Agreement to be voided is a result which, when viewed in the context of the nature of the transaction, the sophistication of the parties, the clarity of Manville's disclosures and the contractual obligation of Johnson to examine the Sale Property, is manifestly unreasonable. Statutes will not be interpreted in a manner leading to absurd or unreasonable results. 534 Hawthorne Ave. Corp. v. Burnes, 204 N.J. Super. 144, 148 [497 A.2d 1265] (App.Div. 1985).
We disagree.
In construing Section 116, we are mindful that our role is to give effect to the Legislature's intent. Monmouth County v. Wissell, 68 N.J. 35, 342 A.2d 199 (1975); Cedar Cove v. Stanzione, 233 N.J. Super. 336, 340, 558 A.2d 1351 (App.Div. 1989), rev'd on other grounds, 122 N.J. 202, 584 A.2d 784 (1991); Coletti v. Union County Bd. of Chosen Freeholders, 217 N.J. Super. 31, 35, 524 A.2d 1270 (App.Div. 1987); State v. H.J.B., 240 N.J. Super. 216, 220-21, 572 A.2d 1205 (Law Div. 1990); Shapiro v. Essex County Bd. of Chosen Freeholders, *304 177 N.J. Super. 87, 92-93, 424 A.2d 1203 (Law Div. 1980), aff'd, 183 N.J. Super. 24, 443 A.2d 219 (App.Div.), aff'd, 91 N.J. 430, 453 A.2d 158 (1982). Sources of legislative intent are the language of a statute, the policy behind it, concepts of reasonableness and legislative history. Cedar Cove, supra, 233 N.J. Super. at 340, 558 A.2d 1351; Shapiro, supra, 177 N.J. Super. at 93, 424 A.2d 1203. However, "[w]hen a statute is clear on its face, the court need not look beyond the statutory terms to determine the legislative intent." State v. Churchdale Leasing, Inc., 115 N.J. 83, 101, 557 A.2d 277 (1989); State v. Butler, 89 N.J. 220, 226, 445 A.2d 399 (1982). Accord In re Adoption of N.J.A.C. 7:26B, ___ N.J. Super. ___ (1991) (slip opinion at 66). The language of Section 116 is straightforward:
a. No person shall contract to sell any land which has been utilized a sanitary landfill facility at any time prior to the effective date of this supplementary act unless the contract of sale for the land shall state the fact and the period of time that the land was so utilized.
What is required is that the contract "shall" state the use of the premises as a "sanitary landfill facility" and the time period involved. The use of the word "shall" by the Legislature carries with it a presumption that the provision is mandatory and not merely permissive. Harvey v. Essex County Bd. of Chosen Freeholders, 30 N.J. 381, 391-92, 153 A.2d 10 (1959); State, Dep't of Envtl. Protection v. Lewis, 215 N.J. Super. 564, 575, 522 A.2d 485 (App.Div. 1987); Bell v. Western Empire Ins. Co., 173 N.J. Super. 60, 65, 413 A.2d 363 (App.Div. 1980). To be sure, this presumption can be overcome by something in the character or context of the legislation which justifies a different meaning, Swiney v. Department of Treasury, Division of Pensions, 84 N.J. Super. 186, 192, 201 A.2d 392 (App.Div. 1964); here, however, there is nothing to suggest that a literal reading of Section 116 would not be "responsive to the essential principle of the law." Alexander v. New Jersey Power & Light Co., 21 N.J. 373, 378, 122 A.2d 339 (1956).
*305 The purpose of Section 116 is to insure that a contract purchaser who is to become an "owner of record of any interest in land whereon a sanitary landfill facility is or has been located," (N.J.S.A. 13:1E-102b); and, in the case of an operating landfill, who will be responsible for the tax (N.J.S.A. 13:1E-104) and escrow (N.J.S.A. 13:1E-109) payments; and who will be "liable for the proper ... closure of the facility ... and for any damages, no matter by whom sustained, proximately resulting from the ... closure," (N.J.S.A 13:1E-103), will receive notice in the prescribed terms in the sale contract itself before entering into the transaction. Why is the use of the term "sanitary landfill facility" so important? The answer is that only by utilizing this triggering language is a buyer on notice that the Closure Act applies. Mere reference to "residue of asbestos and asbestos-containing products," for example, is no substitute for the "sanitary landfill facility" language. If the asbestos residue resulted from years of manufacturing utilizing hazardous substances and the property had not been used for the disposal of manufacturing wastes, ECRA would be the remedial statute and the Closure Act would be inapplicable. Under ECRA, "[t]he cleanup plan is ordinarily implemented by the present owner or operator, but a transferee may assume that responsibility. N.J.S.A. 13:1K-9c." (Emphasis added). Dixon Venture v. J. Dixon Crucible Co., 235 N.J. Super. 105, 109, 561 A.2d 663 (App.Div. 1989); aff'd, 122 N.J. 228, 232, 584 A.2d 797 (1991). See In re Adoption of N.J.A.C. 7:26B, supra, slip opinion at 8-9. If, on the other hand, the asbestos residue resulted from the use of some portion of the premises as a depository for solid waste for more than a six-month period, the Closure Act applies with concomitant liability for closure, as well as for damages to third parties, devolving on the buyer. N.J.S.A. 13:1E-103. Any language short of the words "sanitary landfill facility" is imprecise in terms of this distinction and does not apprise the buyer that he or she is subject to the *306 Closure Act which is entirely distinct from ECRA.[2] That, to us, is the point of the mandatory language of Section 116.
Important to us, as well, is that a statute must be interpreted in light of its common law antecedents. As Judge Goldmann noted in Magierowski v. Buckley, 39 N.J. Super. 534, 554, 121 A.2d 749 (App.Div. 1956) (quoting Yanow v. Seven Oaks Park, Inc, 11 N.J. 341, 350, 94 A.2d 482 (1953)):
"A legislative body in this State is presumed to be familiar not only with the statutory law of the State, but also with the common law." There is a presumption against useless legislation; a purposeful alteration of the existing law must be attributed to the Legislature.
The common law of New Jersey imposes a duty on a seller of real property to affirmatively disclose to the buyer a latent defective condition material to the transaction. Weintraub v. Krobatsch, 64 N.J. 445, 317 A.2d 68 (1974); Correa v. Maggiore, 196 N.J. Super. 273, 281, 482 A.2d 192 (App.Div. 1984); Keen v. James, 39 N.J. Eq. 527, 540-41 (E. & A. 1885). Accord T & E Industries, Inc. v. Safety Light Corporation, 123 N.J. 371, 388, 587 A.2d 1249 (1991). The use of the Manville site as a sanitary landfill facility is clearly such a condition requiring disclosure. See State, Dep't of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 503-04, 468 A.2d 150 (1983). At common law, Manville (and indeed any other owner of property used as a sanitary landfill facility) could have satisfied its disclosure duty by oral or other parol disclosure. On the contrary, the Closure Act expressly states that the disclosure shall be in the contract of sale and that "[t]he remedies provided ... are in addition to those provided by existing ... common law...." N.J.S.A. 13:1E-115. The words "contract of sale for the land shall state" as used in Section 116 impose an obligation on the *307 seller in addition to that existing at common law. That obligation is to set forth in the contract with specificity the period for which land has been used as a sanitary landfill facility and to render ineffective disclosures other than that prescribed.
Why would the Legislature be concerned over the way in which a disclosure is made? The answer is clear: to avoid litigation such as this which is spawned by the "hotly contested ... questions of credibility" generated by a full disclosure mandate lacking specific methodology. Correa v. Maggiore, supra, 196 N.J. Super. at 281, 482 A.2d 192. Indeed, we regard this case as demonstrative of one of the very evils that Section 116 was intended to address.

IV
Alternatively, Manville argues that even if Section 116 mandates that the "sanitary landfill facility" language be present in the contract of sale, its omission does not give a buyer an automatic right to void the contract but allows an offending seller to prove actual notice in another manner by way of equitable defenses to an action to void. This is part and parcel of Manville's argument that Johnson as a "sophisticated purchaser" under section 5.04 of the contract is not protected by Section 116. There is nothing in the Act to suggest that it is meant to protect only the so-called "innocent" purchaser.[3] Further, *308 if the Legislature intended that the disclosure requirements of Section 116 would be satisfied by other means, it could have said so. It did not. What Manville refers to as requiring an "incantation" is merely a facial reading of the statute.
Manville also urges that by using the word "voidable" in Section 116 instead of declaring a nonconforming contract "void", the Legislature again expressed an intent that equitable defenses in the nature of parol disclosure should be recognized where the seller has failed to adhere to the letter of the law. Again, we disagree. The Legislature did not use the term "void" because declaring the contract void could easily have the effect of rewarding a wrongdoing seller and punishing an innocent buyer (in a rising real estate market, for example). Declaring it voidable, on the other hand, obviated the possibility of enforcement by the wrongdoer but not by the wronged party, except at his or her election. What the Legislature intended here, we think, was that buyers, the members of the class protected by Section 116, would have the right to determine whether and under what circumstances to proceed with a contract which violated that statute. This reading of the term "voidable" is an incentive to sellers to abide by the statute and is the only interpretation consonant with the effectuation of the public policy behind Section 116. See Freedman v. Clonmel Construction Corp., 246 N.J. Super. 397, 587 A.2d 1291 (App. Div. 1991). Manville's interpretation would effectively eliminate the mandatory language from the Act, return us to the common law scheme of disclosure and defeat the legislative will as *309 expressed in Section 116. Adopting Manville's interpretation of the term "voidable" would also require us to do by indirection what we refused to do directly  declare that the clear language of Section 116 does not mean what it says. This we will not do.

V
The only remaining question is whether a sanitary landfill facility underlay the property that Manville contracted to convey to Johnson. We agree with the trial judge that this matter was not ripe for summary judgment because a factual question remained as to whether, under the terms of the agreement, Manville could totally exclude the landfill portion from the Sale Property. We rest our determination, as did the trial judge, on Manville's argument that by the "amorphous nature of the Sale Property as defined by the ... contractual language," the exact boundaries of the Sale Property have yet to be defined.
What property Manville is required to convey and what conditions imposed on the property will meet the contractual obligations cannot be determined on this record because of documentary ambiguity. We note, for example, that the Sale Property is described in section 1.01 of the agreement as "approximately one hundred (100) acres of real property with approximately 1.7 million square feet of improvements thereon." However, according to that section, the "precise boundaries" of the Sale Property remain to be established after approval of a rehabilitation plan under ECRA as described in section 5.02. Section 1.01 goes on to provide price adjustments in the event that "the Sale Property is determined to consist of less than 90 acres or more than 110 acres." Although the map annexed as Exhibit A to the agreement and referenced in section 1.01 appears to show that all of the buildings at the site are being conveyed to Johnson, it is conceded that there are 2.1 million square feet of improvements at the site while the agreement only provides for the conveyance of approximately *310 1.7 million square feet. Johnson claims that all of the buildings were meant to be included in the transaction and that the actual square footage was inconsequential while Manville contends that 1.7 million square feet of improvements was all that was contemplated. This is important because Manville asserts that within the described acreage and the 2.1 million square feet of improvements it can convey the 1.7 million square feet contemplated by the agreement and that none of that property will contain a sanitary landfill.[4] Manville's ability to make the contractual conveyance without the sanitary landfill seems problematic to us. However, the parties' intentions are simply not ascertainable with certainty from the record as it is presently constituted. Thus, on this issue, the matter was not ripe for summary judgment. See Exxon Corp. v. Wagner, 154 N.J. Super. 538, 382 A.2d 45 (App.Div. 1977) and Allen v. Planning Bd. of Evesham Tp., 137 N.J. Super. 359, 349 A.2d 99 (App.Div. 1975). We therefore affirm the determination of the trial judge denying summary judgment on this issue.
In light of our holding on the applicability of the Closure Act, we reverse the finding of the trial judge that Johnson is precluded from invoking the Act. If it is determined, after such further proceedings as the trial judge deems warranted, that Manville cannot convey the Sale Property free of the sanitary landfill, then as a matter of law, Johnson is entitled to void the contract.
Affirmed in part; reversed in part.
NOTES
[1] This statutory disclosure requirement is amplified in the DEP regulations. N.J.A.C. 7:26-2A.9(c), in applicable part, prescribes:

3. No person shall contract to sell any land which has been utilized as a sanitary landfill facility at any time unless the contract of sale for the land describes such use and the period of time that the land was so utilized, as required in (c)4 below. Upon written request, any prospective purchaser of such land may obtain from the department a history of the compliance by the landfill with all applicable statutes, rules and regulations administered by the department.
4. Upon closure of the sanitary landfill, a detailed description of the landfill shall be recorded, along with the deed, with the appropriate county recording office. The description shall include the general types, locations, and depths of wastes on the site, the depth and type of cover material, the dates the landfill was in use and all such other information as may be of interest to potential landowners, and shall remain in the record in perpetuity.
[2] During oral argument, the Deputy Attorney General representing DEP acknowledged that ECRA was the starting point of the DEP analysis of the Manville site but that both ECRA and the Closure Act provide remediation mechanisms for such a site which is an industrial establishment within the meaning of N.J.S.A. 13:1K-8(f), and a portion of which meets the definition of sanitary landfill facility in N.J.S.A. 13:1E-3q.
[3] A similar argument has been raised and rejected under the Interstate Land Sales Full Disclosure Act, 15 U.S.C.A. § 1701 to -1720, which requires that, in certain subdivision sales, a "property report" must be furnished to the purchaser before the signing of the contract. If it is not, the contract may be revoked at the option of the purchaser. 15 U.S.C.A. § 1703(c). In Rockefeller v. High Sky, Inc., 394 F. Supp. 303 (E.D.Pa. 1975), the court held that the developer could not maintain the defense that they had given the purchasers all, or substantially all, the information which the property report would have given them. The court specifically rejected the developer's argument that it should be given the opportunity to show that the purchasers were "sophisticated business people":

What defendant seeks an opportunity to prove is irrelevant. The short answer to defendant's contention is that had Congress intended to provide developers with an alternative means of furnishing information to purchasers, it could have said so very plainly and simply. Instead, Congress clearly and explicitly made the purchaser's right to rescind depend only on the failure to file the statement of record and the failure to furnish the printed property report at or before the time of the signing of the agreement.
Id. at 305. See also Law v. Royal Palm Beach Colony, Inc., 578 F.2d 98 (5th Cir.1978) (holding that substantial compliance is no defense); Schatz v. Jockey Club Phase III, Ltd., 604 F. Supp. 537 (S.D.Fla. 1985) (holding that the purpose of the Act, which is to protect the consumer, would be thwarted if the purchaser were required to show actual injury in order to rescind).
[4] Although Manville's written opposition to Johnson's motion for summary judgment did not raise this issue, its counsel briefly argued the point at the motion hearing before the trial judge from documents of record and repeated the argument before us.