**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, Plaintiff,**

v.

**GLOUCESTER ENVIRONMENTAL MANAGEMENT SERVICES, INC., et al., Defendants.**

Civ. A. No. 84–0152 (SSB).

United States District Court, D. New Jersey.

Aug. 25, 1992.

**1212**

Robert Del Tufo, Atty. Gen. of N.J. by Edward Devine, Trenton, N.J., for plaintiff.

Kenney & Kearney by John Kearney, Cherry Hill, N.J., for defendants Amadei Sand & Gravel, Inc., and Anthony Amadei, as officer, shareholder and/or director of Amadei Sand & Gravel, Inc.

Parker, McCay & Criscuolo by Jeffrey Heppard, Marlton, N.J., for defendants Gloucester Environmental Management Services, Inc., Richard Winn, David Ehrlich, and Anthony Amadei, as officers, shareholders and/or directors of Gloucester Environmental Management Services, Inc.

Sills Cummis Zuckerman Radin Tischman Epstein & Gross, P.A. by William S. Greenberg, Helen E. Kleiner, Newark, N.J., for defendant Tp. of Gloucester.

## OPINION

BROTMAN, District Judge:

Presently before the court is the motion of the individual operator defendants, Anthony Amadei, Richard Winn and David Ehrlich, for partial summary judgment dismissing the claims asserted against them pursuant to the Sanitary Landfill Facility Closure and Contingency Fund Act

*N.J.S.A.* 13:1E–100 *et seq.* The individual operator defendants argue that summary judgment is appropriate because they cannot be held liable as "owners or operators" [1] of the GEMS Landfill as defined by the Sanitary Landfill Facility Closure and Contingency Fund Act since each of them owned less than a majority share of Amadei Sand & Gravel, Inc., [AS & G], and Gloucester Environmental Management Services, Inc., [GEMS], the two corporations formed to operate the GEMS Landfill. The court holds that although the individual operator defendants own less than a majority share of the corporations, they may be held personally liable as "owners or operators" under the Sanitary Landfill Facility Closure and Contingency Fund Act if they had a high degree of personal involvement in the operation and decision-making of the corporations. As genuine issues of material fact exists regarding the role of each individual operator defendant as an active operator of the GEMS Landfill, the court denies the defendants' motion for summary judgment.

## I. FACTS AND PROCEDURE

The New Jersey Department of Environmental Protection, now known as the New Jersey Department of Environmental Protection and Energy, ("NJDEPE"), originally brought suit against the operator defendants in October, 1980.[2] The NJDEPE asserted various statutory and common law causes of action arising from the disposal of allegedly hazardous substances at a landfill located in Gloucester Township, known variously as the Gloucester Township Landfill, the Amadei Sand & Gravel Landfill and the GEMS Landfill, ("the Landfill"). Specifically, the NJDEPE has alleged that the Sanitary Landfill Facility Closure and Contingency Fund Act *N.J.S.A.* 13:1E–100 *et seq.* (the Closure Act) has been violated. This Act imposes liabili-

---

**1.** The Sanitary Landfill Facility Closure and Contingency Fund Act imposes joint and several liability on "owners and operators" of landfill facilities. N.J.S.A. 13:1E–103.

**2.** The operator defendants include Amadei Sand & Gravel, Inc., and Anthony Amadei as officer,

shareholder and director of Amadei Sand & Gravel, Inc., as well as Gloucester Environmental Management Services, Inc., and Richard Winn, David Ehrlich and Anthony Amadei, as officers, shareholders and directors of Gloucester Environmental Management Services, Inc.

ty on owners and operators of a sanitary landfill for the improper operation or closure of a sanitary landfill.

In Count V of the Fourth Amended Complaint, the NJDEPE alleges that AS & G and GEMS, as the corporate entities operating the GEMS Landfill, violated the Closure Act by failing to operate and close the Landfill as required by law. The NJDEPE further alleges in Count X of the Fourth Amended Complaint that AS & G and GEMS were "sham corporations which ... failed to observe the formalities of corporate law and have been used by defendants ... to insulate themselves from individual liability for their misconduct in operating the Gloucester Township landfill." The NJDEPE demands that these three individual operator defendants be held individually, jointly and severally liable under the Closure Act as operators of the GEMS Landfill.

The individual operator defendants, Anthony Amadei, Richard Winn and David Ehrlich, have filed a motion seeking partial summary judgment dismissing claims asserted by the NJDEPE in Count V of the Fourth Amended Complaint as applied to them through Count X. They also seek a declaration that they have no individual liability to compensate NJDEPE for monies paid out from the Sanitary Landfill Facility Contingency Fund for any damages to third parties allegedly related to the GEMS Landfill. The individual operator defendants claim that because none of the individual operator defendants owned a majority interest of either AS & G or GEMS, the two corporations formed to operate the GEMS Landfill, they cannot be considered "operators" of the GEMS Landfill as defined by the Closure Act.

The individual operator defendants owned less than a majority interest of both AS & G and GEMS. Anthony Amadei was the former president and a shareholder of AS & G. When AS & G was formed Amadei owned 50 percent of the stock and has thereafter owned "owned less than 50 percent of the share in the stock of AS & G." *See Affidavit of Anthony Amadei.*[3] In 1975, when GEMS was formed to take over the operation of the landfill from AS & G, Amadei received 27 percent of the shares of stock. *Id.* The only other shareholders included Richard Winn who received 40 percent of the stock, *see Affidavit of Richard Winn,* and David Ehrlich who received 27 percent of the stock. *See Affidavit of David Ehrlich.* Dennis Dubin initially received 6 percent of the stock, but turned over his 6 percent to Ehrlich and Winn who each received 3 percent. *See Affidavit of Richard Winn; Affidavit of David Ehrlich.*

## II. DISCUSSION

### A. *The Standard*

Pursuant to Rule 56(c), the court may grant summary judgment only when the record reveals "that their is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prod. Co.,* 789 F.2d 230, 232 (3d Cir.1986). In deciding whether there is a disputed issue of material fact the court must resolve all inferences and reasonable doubts in favor of the non-moving party. *Meyer v. Riegel Prod. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The Supreme Court articulated the allocation of burdens between the moving and

---

**3.** Anthony Amadei stated in his original Affidavit that, "during all the times that AS & G allegedly operated the Gloucester Township landfill, I owned less than 50 percent of the shares in stock of AS & G." *Affidavit of Anthony Amadei.* This statement was later corrected by his counsel at the hearing on Type IV Summary Judgment motions held before Judge Stanley S. Brotman on January 30, 1992 to reflect that Amadei owned 50 percent of AS & G when it was formed and less than 50 percent at some later date.

nonmoving parties in a motion for summary judgment in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The *Celotex* Court held that the moving party has the initial burden of demonstrating that no genuine issue of material fact exists, but this burden did not require the moving party to support their motion with affidavits or other materials to negate the nonmoving party's claim. *Id.* at 323, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The Supreme Court also held that "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions, on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553 (*quoting* Fed.R.Civ.P. 56(e)).

"A motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505 and *Celotex Corp.*, 477 U.S. 317, 106 S.Ct. 2548). The court may grant summary judgment, however, if the nonmoving party's evidence is merely "colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

### B. *Statutory Construction*

■ In construing a statute, the court must first look at the evident wording of the statute to ascertain its plain meaning

and intent. *Renz v. Penn Cent. Corp.*, 87 N.J. 437, 440, 435 A.2d 540 (1981). The court "should try to give effect to every word of the statute, and should not assume that the legislature used meaningless language." *Medical Soc'y v. Dep't of Law and Pub. Safety*, 120 N.J. 18, 26, 575 A.2d 1348 (1990) (*citing Gabin v. Skyline Cabana Club*, 54 N.J. 550, 555, 258 A.2d 6 (1969)). The court should not construe a statute so as to render any part of it inoperative or superfluous. *Paper Mill Playhouse v. Millburn Township*, 95 N.J. 503, 521, 472 A.2d 517 (1984); *Abbotts Dairies, Inc. v. Armstrong*, 14 N.J. 319, 328, 102 A.2d 372 (1954). The underlying policy and purpose of enacting a statute provides additional assistance in correctly interpreting the statute. *Cedar Cove, Inc. v. Stanzione*, 122 N.J. 202, 584 A.2d 784 (1991).

■ The Closure Act provides that "[e]very owner or operator of a sanitary landfill facility shall be jointly and severally liable for the proper operation and closure of the facility, as required by law, and for any damages, no matter by whom sustained, proximately resulting from the operations or closure." N.J.S.A. 13:1E–103. In their motion for partial summary judgment, the individual operator defendants assert that because none of them own a majority interest of AS & G or GEMS they are not "owner or operators" of the GEMS Landfill as defined by the Closure Act so as to be jointly and severally liable for the damages resulting from improper operation or closure of the Landfill.

It is undisputed that none of the individual operator defendants have owned more than fifty percent of the stock, or a majority interest, of either AS & G or GEMS.[4] The NJDEPE, however, argues that the individual operator defendants fit well within the definition of "owner or operator" set forth in the Closure Act.

---

**4.** Although the Closure Act does not define the term "majority interest," the court notes that the plain meaning of the phrase denotes one who owns more than fifty percent of the shares. *See* Websters Third New International Dictionary (Merriam–Webster, 1971) (defines "majority" as "a greater number than half of the total"). The court further notes that Blacks Law Dictionary 955 (6th ed. 1990), defines "majority stockholder" as "one who owns or controls more than 50 percent of the stock of a corporation, though effective control may be maintained with far less than 50 percent if most if the stock is widely held."

The Closure Act's plain language refutes the individual operator defendants' assertion that they cannot be considered an "owner or operator" because they each owned less than a majority interest in AS & G and GEMS. While the Closure Act provides that majority shareholders are liable as owners or operators, the Closure Act does not limit liability only to those who own a majority interest in the corporation. Rather, the Closure Act's definition of "owner or operator" provides:

'owner *or* operator' means and includes, *in addition to the usual meanings thereof,* every owner of record of any interest in land whereon a sanitary landfill facility is or has been located, and any person or corporation which owns a majority interest in any other corporation which is the owner or operator of any sanitary landfill facility.

N.J.S.A. 13:1E–102(b) (emphasis added).

At the outset, it is clear that a party may be liable as an "operator" even though not an "owner," because the term "owner *or* operator" is in the injunctive. We cannot assume that the word "operator" has no meaning apart from "owner." The specified listings of § 102(b) above pertain to degrees of individual *ownership*, while the definition of "operator" is left to its "usual meanings."

A shareholder may therefore be liable under the Closure Act even though they do not possess a majority interest if the shareholder classifies as an "operator" within "the usual meanings" of the term or if the shareholder is an owner of record of land upon which a sanitary landfill facility is or has been located. To hold that the defendants were specifically excluded from liability simply because they do not own a majority share would render the remaining part of the definition superfluous. *See Medical Soc.,* 120 N.J. at 26–27, 575 A.2d 1348 (courts "should try to give effect to every word of the statute, and should not

assume that the Legislature used meaningless language ... nor ... construe the statute to render part of it superfluous.").

The court must therefore address whether the individual operator defendants may be liable as "owners or operators" under the "usual meanings" of the term.

### C. *"Usual meanings" of owner or operator*

■ The court finds that an individual will be considered an operator under the "usual meanings" of the term such that individual liability may be imposed where that individual shows a high degree of personal involvement in the operation and decision-making process of the business. In so holding, the court is guided both by the plain meaning of the term "operator" and the interpretation of that term by other courts.

■ In order to determine the "usual meanings" of a particular term, courts have approved the use of a recognized standard dictionary. *See United States v. Burke,* — U.S. —, — & —, 112 S.Ct. 1867, 1872 & 1875, 119 L.Ed.2d 34 (Court used recognized standard dictionaries in interpreting the Internal Revenue Code); *New Castle County v. Hartford Accident and Indem. Co.,* 933 F.2d 1162, 1182 (3d Cir.1991); *Broadwell Realty v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 533, 528 A.2d 76 (App.Div.1987). According to Webster's Third New International Dictionary (Merriam–Webster, 1971), the "usual meanings" of operator include "a person that actively operates a business whether as owner, lessor or employee."[5]

The court is also guided by the interpretation of "owner or operator" in *United States v. Conservation Chem. Co.,* 628 F.Supp. 391 (W.D.Mo.1985). The *Conservation Chem.* court interpreted the term "owner or operator" under § 107 of CERC-

---

5. Because the court finds that the Closure Act imposes liability on a person actively operating a business, as well as a person who owns a majority interest in the corporation, the mere fact that each of the defendants owned less than a majority interest in AS & G and GEMS does not necessarily enable them to escape liability under the Closure Act. The Closure Act does not mean to exclude a person who actively operates a business just because that person owns less than a majority interest.

LA[6] to impose liability on an individual who was the founder, chief executive officer and majority shareholder of the company, but who also controlled the company's financial matters, administered the affairs of the corporation, executed contracts on its behalf, was the person who gave instructions on equipment, modifications, and customers to be served, and was the person to whom plant managers reported. *Id.* at 420. Based on these facts and the "high degree of *personal* involvement in the operation and decision-making process" the *Conservation Chem.* court concluded that the imposition of personal liability was appropriate. *Id.*

In *United States v. New Castle County*, 727 F.Supp. 854 (D.Del.1989), the court outlined numerous inquiries to be considered in determining whether to impose operator status under CERCLA. Although the instant case deals with the interpretation of the Closure Act, the inquiries outlined by the court in *New Castle* denote relevant factors which correspond to the degree of control generally required for one to be considered an "operator" according to the "usual meanings" of the term. The court should inquire

> whether the person sought to be strapped with operator status controlled the finances of the facility; managed the employees of the facility; managed the daily business operations of the facility; was responsible for the maintenance of environmental control at the facility; and conferred or received any commercial or economic benefit from the facility....

*Id.* at 869. This court notes that although these factors are helpful in making a determination of operator status, the list is not intended to be exclusive, rather it is illustrative of various relevant considerations that form part of a general inquiry into whether an individual has exercised a sufficient degree of control to be considered an "operator."

New Jersey courts have applied a similar analysis to hold principles personally liable for a corporation's violation of an environmental statute, even though they own less than a majority share of the corporation, where they have a high degree of personal involvement in the operation and decision-making process of the corporation. *NJDEPE v. Anthony Amadei and Jersey Envtl. Management Serv. Inc. [JEMS],* Docket No. A–3508–79T1 (App.Div. June 5, 1981). In JEMS, the Appellate Division held that one of the individual operator defendants in this case, Amadei, was personally responsible for violations at another landfill, commonly known as the JEMS Landfill, despite the fact that Amadei owned only 24% of the JEMS corporation. *Id.* at 2. The Appellate Division reasoned that it was proper to hold Amadei personally liable where Amadei had prime administrative authority, was designated as "manager" of the facility, was a member of the board of directors, had extensive experience in the collection and disposal of solid waste, performed weekly inspections of the site, was consulted by officers on operational matters and established policies and procedures which violated environmental statutes. The court summarized its reasoning:

> "Anthony Amadei, was in actual charge of and responsible for the overall management, control and operation of [the] sanitary landfill ... he personally was aware of and, on occasion, personally participated in the various violations of the statute ... and that the employees of JEMS engaged in the day-to-day functioning of the sanitary landfill were carrying out and effectuating the policies and procedures prescribed and established by Mr. Amadei, as administrator and manager."

*Id.*

Our holding that the individual operator defendants may be held personally liable if they had a high degree of *personal* involvement in the operation and decision-

---

**6.** Section 107, 42 U.S.C. § 9607(a) provides, in relevant part, that "the owner or operator of a vessel or facility" and "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed" are subject to liability under CERCLA.

making process of either AS & G or GEMS is consistent with the interpretation of the phrase "owner or operator" by other courts. *See* Elizabeth Ann Glass, *The Modern Snake in the Grass: An Examination of Real Estate & Commercial Liability Under the Superfund & Sara and Suggested Guidelines for Practitioners,* 14 Boston U.Env.L.J. 381–446, 402–05 (1987). For example, in *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985), the court held that an owning stockholder who manages the corporation is liable under CERCLA as an "owner or operator." The *Shore Realty* court specifically stated that "[the officer] is in charge of the operation of the facility in question, and as such, is an 'operator' within the meaning of CERCLA" § 107, 42 U.S.C. § 9607. *Id.* The *Conservation Chemical* court similarly concluded that the corporate officials who actively participated in the management of a disposal facility could be held personally liable under 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1) and (a)(2). *Conservation Chem.,* 628 F.Supp. at 419.

### D. *Purpose of Closure Act*

■ Moreover, an examination of Legislative purpose underlying the Closure Act also supports the conclusion that the Legislature did not intend to exclude from liability shareholders of corporation who have a high degree of personal involvement in the operation and decision-making process of the corporation. *Coletti v. Union County Bd. of Chosen Freeholders,* 217 N.J.Super. 31, 524 A.2d 1270 (App.Div.1987) (In construing a statute, the court must give effect not only to the plain language, but also to the Legislature's intent); *Cedar Cove, Inc. v. Stanzione,* 122 N.J. 202, 584 A.2d 784 (1991) (Legislature's overall policy and purpose of enacting a statute provides additional assistance in correctly interpreting

the statute); *see also Regional Recycling v. New Jersey Dep't of Envtl. Protection,* 127 N.J. 568, 570–71, 606 A.2d 815, 816 (1992).

The Closure Act was enacted to "ensure proper closure of sanitary landfill facilities" and to provide compensation to persons adversely affected by "improper operation or closure of any sanitary landfill." Assembly Committee Statement to Assembly, No. 1935, April 27, 1981. The broad policy agenda underlying the Closure Act is evidenced by the legislative findings supporting it:

> [t]he proper closure of sanitary landfills is essential to the public health, safety and welfare; that closure activities can require capital expenditures at a time when revenues collected by sanitary landfill facilities are minimal or nonexistent; and that it is necessary to guarantee that adequate funds are reserved to insure such closure.
>
> ... the improper operation or closure of sanitary landfill facilities can result in the contamination of surface and ground waters ... that the migration of methane gas from sanitary landfill facilities poses a significant threat to life and property; that compensation for the damage resulting from improper operation or closure is, at best, inadequate; and that it is necessary to provide a mechanism for the prompt and adequate compensation for these damages.

*Johnson Machinery v. Manville Sales,* 248 N.J.Super. 285, 299–300, 590 A.2d 1206 (App.Div.1991) (quoting N.J.S.A. 13:1E–101).

New Jersey courts have interpreted the Closure Act broadly to fulfill the policy and purpose of the Closure Act.[7] In *Johnson Machinery,* 248 N.J.Super. at 285–90, 590 A.2d 1206, for example, a purchaser of property brought an action against the ven-

---

7. In *The New Jersey Environmental Law Handbook,* the authors noted that the definition of "owner of operator" is broad and that the breadth of this definition "makes virtually all past, present and future landfill 'owners and operators' potentially subject to strict liability for improper landfill operation or closure. The scope of liability is further enlarged by the statutory definition of 'closure' which includes 'all

activities and costs associated with the design, purchase, construction or maintenance of all measures required by the [NJDEPE] ... in order to prevent, minimize or monitor pollution or health hazards resulting from sanitary landfill facilities...." Lownstein, Sandler, Kohl, Fisher & Boylan, *The New Jersey Environmental Law Handbook* (Michael L. Rodburg et al. eds., 1989).

dors of the property to rescind the contract for noncompliance with the Closure Act. The vendor claimed that the Closure Act did not apply to sole source landfills. The Superior Court rejected the vendors argument and interpreted the term "sanitary landfill facility" broadly in light of the legislative purpose of the Closure Act, cited above to hold that term includes a sole source landfill which operates only as the depository of the waste its own commercial operation has generated. *Id.* at 290, 590 A.2d 1206.

Similarly, this court's interpretation of the term "owner or operator" to include those shareholders who have a high degree of personal involvement in the operation and decision-making of the corporation furthers the legislative purpose of the Closure Act to ensure proper closure of sanitary landfills, compensate those adversely affected by improper operation or closure and protect the public health and safety. *See id.; see also United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 743–44 (8th Cir.1986) (court held that individual liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3) was broad to be consistent with the broad remedial purposes of CERCLA).

The Legislature's intent would be circumvented if this court were to interpret the Closure Act so as to shield from liability a shareholder of a corporation who is significantly involved in the management, operation and control of the corporation. *See Northeastern Pharmaceutical,* 810 F.2d at 743 ("construction of CERCLA to impose liability upon only the corporation and not the individual corporate officers and employees who are responsible for making corporate decisions about the handling and disposal of hazardous substances would open an enormous, and clearly unintended, loophole in the statutory scheme."); *see also Shore Realty,* 759 F.2d at 1052 (to further clean-up of hazardous wastes and compensate for destruction of natural resources, court refused to allow responsible individuals to hide behind protection of corporate laws). The broad policies underlying the Closure Act mandate that those persons who are in a position to know of

and control the improper operation and closure of landfills be held liable as "owners or operators" for the violations of the Closure Act.

### E. *Application of the standard*

■ The court finds that there are genuine issues of material facts as to whether the individual operator defendants have had a high degree of personal involvement in the operation and decision-making process of the corporations so as to come within the meaning of the term "owner or operator." In a case before the New Jersey Superior court involving the GEMS landfill, Amadei testified as to his ongoing management of the Landfill and his familiarity with the work-force at the Landfill: "some of the fellows used to work with Gohagen [hired because he owned a front-end loader and would move soil to cover refuse], some worked for me. Some of them they just worked for me on a part-time basis ... they were hangers-on, you know, after we got closed, these guys just came around and hung around the trailer...." (Exh. 1 to plaintiff's brief, Transcript of February 19, 1981 testimony of Anthony Amadei in *State of New Jersey v. GEMS,* Superior Court, Ch.Div.No. C–661–80 at 25–26). Amadei also sent letters to generators or haulers informing them that they could bring the material to the Landfill and that the material would conform to existing regulations. (Exh. 3 to plaintiff's brief, letter from Amadei to Berk).

Various New Jersey court opinions also contain specific findings of fact that Amadei, Winn and Ehrlich were personally responsible for the operation of the GEMS landfill. *See Transamerica Ins. Co. v. Thomas M. Durkin & Sons, Inc. and Durkin Contracting, Inc.,* 1991 WL 206765, 1991 U.S.Dist. LEXIS 14318 (E.D.Pa. Oct. 1, 1991), *reconsideration denied,* 1991 WL 246927, 1991 U.S.Dist. LEXIS 16715; *NJDEPE v. Anthony Amadei and Jersey Envtl. Management Serv. Inc. [JEMS],* Docket No. A–3508–79T1 (App.Div. June 5, 1981). In *Transamerica,* the court found that Anthony Amadei and Sidney Liss (now deceased) personally guaranteed AS & G's

performance of the lease agreement with the Gloucester for the GEMS landfill site, including that AS & G would adhere to all present and future laws, rules, or regulations of New Jersey, Camden County and Gloucester Township regarding operation and maintenance. *Id.* 1991 WL 206765 at *14, 1991 U.S.Dist. LEXIS 14318 at *17.[8]

The *Transamerica* court also found that "[a]mong the principle officers of Amadei Sand & Gravel and the individuals responsible for the operation of the landfill site and the disposal of hazardous substances therein were *Anthony Amadei,* Jack M. Liss and Sidney Liss (now deceased)." *Id.* (emphasis added). The court further found that, after the rights of AS & G to operate the landfill were transferred to GEMS, "the principals and officers of GEMS were *Anthony Amadei,* Dennis Dubin, *David Ehrlich and Richard Winn.... All were responsible for the operation of the landfill site* and for the disposal of hazardous substances therein." *Id.* (emphasis added).

The court finds that genuine issues of material fact exist as to whether the individual operator defendants had a high degree of involvement in the operation and decision-making process of the corporations so as to come within the meaning of the term "owner or operator." Genuine issues of material fact exist as to many of the factors which may be considered in determining whether the defendants had a sufficient degree of control: whether the defendants controlled the finances of the facility; managed the employees of the facility; managed the daily business operations of the facility; were responsible for the maintenance of environmental control at the facility; and conferred or received any commercial or economic benefit from the facility. Accordingly, defendants' motion for summary judgment must be denied.

### F. Piercing the Corporate Veil

Although the NJDEPE implies that defendants may be liable under a theory of piercing the corporate veil, the court need not reach this analysis as to these individual operator defendants since the court finds that there are genuine issues of material fact as to whether the defendants are liable under the "usual meanings" of the term "owner or operator." [9] Similarly, other courts have held shareholders personally liable without piercing the corporate veil where the shareholder actively participated in the management of the landfill. *See Northeastern Pharmaceutical,* 810 F.2d at 726. In *Northeastern Pharmaceutical,* the court held that

[the corporate officer] can be held individually liable because he personally participated in conduct that violated CERCLA; this personal liability is distinct from the derivative liability that results from 'piercing the corporate veil.' 'The effect of piercing a corporate veil is to hold the owner [of the corporation] liable. The rational for piercing the corporate veil is that the corporation is something less than a bona fide independent entity.' *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir.1978). Here, [the corporate officer] is liable because he personally participated in the wrongful conduct and not because he is one of the owners of what may have been a less than bona fide corporation.

*Id.* at 744. Similarly, in *New York v. Shore Realty Co.,* the court rejected the use of the doctrine of piercing of the corporate veil, and instead held the shareholder liable because of his active and extensive role in the daily management of the company. *Shore Realty,* 759 F.2d at 1052; *see also United States v. Mottolo,* 605 F.Supp. 898, 913–14 (D.N.H.1985) (court found that

---

**8.** This agreement between AS & G and Gloucester Township obligated the operator to accept without charge any garbage, trash, debris or junk delivered by any resident of Gloucester Township or any governmental unit located in Gloucester. *Id.*

**9.** Generally corporate shareholders or officers may be held personally liable for the corporation's violations of the law where the officer has participated in the wrongful acts of the corpora-

tion or where the court finds that it is appropriate to pierce the corporate veil. *See* Elizabeth Ann Glass, *The Modern Snake in the Grass: An Examination of Real Estate & Commercial Liability Under the Superfund & Sara and Suggested Guidelines for Practitioners,* 14 Boston U.Env.L.J. 381–446, 395–96; *Newlin Corp. v. Commonwealth of Pa. Dep't of Envtl. Resources,* 134 Pa.Cmwlth. 396, 401, 579 A.2d 996, 999.

it was not necessary to pierce the corporate veil to hold a shareholder or officer individually liable under CERCLA where there are alternative grounds for individual liability).

The court further notes that in order to pierce the corporate veil, evidence must be presented to show that the corporation is a "sham" which exists to avoid personal liability of the officers.[10] No evidence has been presented to the court for it to make a fair determination that GEMS either is or is not a "sham" corporation. In addition, a consideration of whether to pierce the corporate veil involves complex issues of law and fact which are not readily amenable to summary judgment. *See The Modern Snake in the Grass,* 14 Boston U.Env.L.J. at 381–446 & 400 (*citing Wehner v. Syntex Corp.,* 24 Env't Rep. (BNA) 1160, 1161 (N.D.Cal.1986)).

### III. CONCLUSION

Because the court finds that the term "owner or operator" in the Closure Act includes a person actively operating a business such that they have a high degree of personal involvement in the operation and decision-making process of the corporation, as well as a person who owns a majority interest in the corporation, the mere fact that each of the defendants owned less than a majority interest in AS & G and GEMS does not necessarily enable them to escape liability under the Closure Act. A genuine issue of material fact exists regarding the degree of the individual operator defendants' personal involvement in the operation and decision-making of both AS & G and GEMS. Accordingly, the individual operator defendants' motion for partial summary judgment must be denied.

---

**10.** The type of evidence required to piece the corporate veil is summarized in *United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981).

Whether the corporation is grossly undercapitalized for its purpose ... failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*see also American Bell Inc. v. Federation of Tel. Workers,* 736 F.2d 879, 886 (3d Cir.1984).