**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0309-19

JOHN P. KEEGAN,

     Plaintiff-Respondent,

v.

TOWN OF KEARNY,

     Defendant-Appellant.

_____

Argued May 5, 2021 – Decided June 21, 2021

Before Judges Fuentes, Whipple, and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3330-15.

Gregory J. Castano, Jr., argued the cause for appellant (Castano Quigley, LLC, attorneys; Gregory J. Castano, Jr., on the briefs).

Amanda G. Dumville argued the cause for respondent (McCarter & English, LLP, attorneys; Lanny S. Kurzweil, of counsel and on the brief; Amanda G. Dumville, on the brief).

PER CURIAM

Defendant, Town of Kearny (Kearny), appeals from an August 2, 2019 order awarding plaintiff, John P. Keegan, $419,967 for clean-up costs associated with "lot 28," located on a 100-acre landfill in Kearny. We affirm.

To understand the trial judge's decision regarding lot 28, it is essential to understand the history of the entire landfill property. In 1942, the town began waste landfilling portions of the New Jersey Meadowlands. In 1946, William Keegan, plaintiff's father, acquired lot 28 from the town. The town later leased the remainder of the landfill to William[1] for $1 for a ten-year term, subject to renewal. The lease, and the 1949 articles of agreement, granted William the right to deposit garbage, refuse, and waste materials throughout the landfill and permitted the town to deposit all refuse and other waste material collected by the town's trucks. The town's Department of Public Health issued William a dumping permit.

For over two decades, William participated in a private joint venture known as the Municipal Sanitary Landfill Authority (MSLA), which operated the landfill. During that time, the town collected waste from its residences and businesses and deposited it in the landfill. The town leased its land, including

---

[1] Due to recurrence of the parties' last names, we refer to some by first name only.

A-0309-19

within the landfill, to the MSLA solely for the operation of a landfill program. The lease permitted the town to deposit all waste it collected on the leased land and permitted town residents to deposit waste in the landfill with a town permit. The ten-year lease term began on June 14, 1969, and the town continued to collect its own garbage and deposit it in the landfill. The town also permitted local private contractors and industrial firms to dispose of waste in leased "dumping land" that included the landfill, upon obtaining a $2 dumping license subject to the approval of the town engineer, mayor, and council. Other types of businesses also submitted applications for dumping permits to the Town Council.

In 1976, plaintiff purchased lot 28 from his parents for $1 and held it as an investment. Two years later, the town and MSLA entered into a new lease agreement that again gave tenants and the town the right to deposit waste only on the leased land owned by the town. This lease, like the 1949 lease agreement, 1949 articles of incorporation, and 1968 lease agreement, did not explicitly mention other lots in the landfill that the town did not own, including lot 28.

In 2005, the town and New Jersey Meadowlands Commission (NJMC) entered into a ten-year lease agreement permitting NJMC to operate a landfill on the town-owned portion of the property, for the ultimate purpose of

3

remediating and properly closing it. NJMC leased 104 acres of town property, but did not lease lot 28 from plaintiff. The lease provided that NJMC would assume sole responsibility, without financial assistance or contribution from the town, for the design and implementation of a closure plan approved by the New Jersey Department of Environmental Protection (DEP). It also contemplated that NJMC would acquire additional property required to operate the landfill via condemnation, including lot 28.

The lease provided, in paragraph 11:

> It is the intention of the parties that the [t]own shall have no expenses whatsoever with respect to the [d]emised [p]remises or the [r]etained [p]remises during the [l]ease term and [NJMC] agrees that it will provide, at its sole cost and expense, for the closure of the . . . [l]andfill.

The lease defined "[d]emised [p]remises" as "all land within Tax Block 205, Lots 24, 27, 29, 30 and 19.02 in the Town of Kearny (the '[d]emised [p]remises'), consisting of approximately 104.356 acres, as more particularly described on the tax map attached hereto as Exhibit A". The "[d]emised [p]remises" did not include lot 28.

In paragraph 27C, the lease contained the following release for the town:

> [NJMC] hereby releases the [t]own from any and all claims of [NJMC] relating to the condition of the [d]emised [p]remises. This release includes (by way of

4

illustration and not limitation) a release by [NJMC] of any claims it may have against the [t]own under CERCLA,[2] the Spill Act,[3] or the Solid Waste Management Act[4] arising from existing conditions on the site.

NJMC subsequently remediated 90.33 acres of the landfill, including lot 28, at a total cost of $21,352,464.14. It completed the remediation in 2008 and reopened the landfill. It also brought a cost-recovery suit against plaintiff for lot 28.

In the trial court's July 5, 2011 judgment from NJMC's cost-recovery suit against plaintiff, it found that plaintiff was not liable to NJMC under the Sanitary Landfill Facility Closure and Contingency Fund Act (Closure Act), N.J.S.A. 13:1E-110 to -230, but that he would be unjustly enriched if he were to receive the "as if remediated value" of lot 28 as a result of NJMC's condemnation, without contributing to its clean-up costs. There were extensive environmental problems at the landfill throughout plaintiff's ownership of lot 28, which he took no action to address, and incurred no expenses for at its closure. The court

---

[2] Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 to 9675.

[3] Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24.

[4] Solid Waste Management Act, N.J.S.A. 13:1E-1 to -230.

therefore entered judgment in favor of NJMC solely to avoid plaintiff's unjust enrichment. Plaintiff was assessed a share of the common costs for remediation based on the ratio of lot 28's area to the total landfill area remediated, along with a share of the costs for certain other common features of the closure plan.

In reviewing that judgment, New Jersey Meadowlands Commission v. Keegan (NJMC), No. A-6090-10 (App. Div. Apr. 19, 2013) (slip op. at 3), we held that the trial court erred in finding that plaintiff was not liable under the Closure Act and because oil-laden soil was found on lot 28, but not on the other lots in the landfill. Id. at 4, 7-8. Thus, we remanded the matter for the trial court to reconsider liability related to NJMC's costs for the construction of a slurry wall, which was a reasonably necessary expense to properly close the landfill. Id. at 23-26.

On August 12, 2013, NJMC and plaintiff entered into a Release and Settlement Agreement in which NJMC released its Closure Act claim against plaintiff and plaintiff released his claim to the $121,633 that he was previously awarded for NJMC's condemnation of a separate property that he owned. NJMC thus settled its claim against plaintiff for lot 28 for $902,167.31. One week later,

6

plaintiff filed the cost-recovery action against the town that is the subject of this appeal.[5]

I.

A bench trial with two expert witnesses occurred in July 2019, on the issue of damages only. At the outset of trial, the parties stipulated that plaintiff sought damages of $902,167.31. The court denied the town's motions in limine to bar plaintiff's expert report as a net opinion and to limit its potential damages to $190,531.89.

Plaintiff distributed a December 2, 2016 report and a March 22, 2019 rebuttal report prepared by Dr. Neil Ram and Dr. Chase Gerbig of Roux Associates, Inc. (Roux reports). The authors reviewed aerial photographs,

---

[5] In lieu of an answer, the town moved to dismiss the complaint for failing to state a claim upon which relief can be granted and for being barred by the entire controversy doctrine. On January 22, 2016, the court denied the motion. The town moved for leave to appeal, which we denied on March 7, 2016.

After the town filed an answer and a third-party complaint seeking indemnity against the New Jersey Sports and Exposition Authority (NJSEA), among other relief, NJSEA moved for summary judgment as to indemnification, and the town cross-moved for summary judgment. On September 16, 2016, the court entered summary judgment in favor of NJSEA and denied the town's cross-motion. Meanwhile, in November 2016, plaintiff moved for partial summary judgment on the issue of liability under the Closure Act. The town subsequently cross-moved for summary judgment on the basis that NJSEA released it from all liability in its lease. On October 12, 2018, the court entered partial summary judgment in favor of plaintiff and denied the town's cross-motion.

A-0309-19

chemical analyses, geotechnical investigations, and historical documents pertaining to the operation of the landfill and the town's waste collection practices.

Gerbig, an expert in the allocation of environmental factors relative to a cleanup, physically inspected lot 28 and the landfill, and reviewed documents specific to landfill operations, deposition testimony from prior litigation, and DEP documents that examined the landfill municipal-solid waste, as well as technical literature and various reports addressing site conditions. He testified that experts in the allocation field generally relied upon such documents because allocating the parties who dumped at the landfill often depended on technical information and historical records to reconstruct the responsible parties' past degrees of involvement.

Gerbig applied both quantitative and qualitative factors in his allocation analysis. The "core underpinning" of his analysis was the quantitative factor, which consisted of the amount of waste the town deposited in the landfill, which he then modified by applying the applicable qualitative factors. He testified that

the qualitative factors he considered were the standard ones used by experts in the allocation field to establish liability for sites with environmental impacts.[6]

To quantify the town's share of the landfill's waste, Gerbig divided the amount the town contributed by the total waste in the landfill. Ideally, one would make that calculation by examining "waste-in tickets" that document how much waste different entities deposited. Because those documents were not available to Gerbig, he used historical documents that demonstrated how much waste the town deposited in the landfill between 1952 and 1958, as well as the town's disposal practices with respect to waste it deposited in the landfill during 1969.

In Gerbig's opinion, the town bore responsibility for the waste in the landfill because it acted as an arranger, a transporter, and a generator of it. He explained that it acted as an arranger by establishing the residents' ability to dispose of waste for free. The town was a transporter and generator because its lease agreements permitted the deposit of waste in the landfill at any time, the expenditure of money on collecting and depositing the waste, and the right to deposit municipal solid waste in the landfill.

---

[6] These qualitative factors were known as the "Gore factors" and "Torres factors," which originated from the legislative history of CERCLA and various legal proceedings.

A-0309-19

Gerbig reviewed quantifiable data in the form of tons per week as to the amount of waste the town disposed in the landfill between 1952 and 1958, and in 1969. The latter figure was significantly lower. In his first method of calculating the town's share, he assumed that it disposed of the lower figure between 1958 and 1969, which rendered it responsible for 42% of the waste. In his second method, he assumed that the town's share of waste was reduced on an incremental, step-down basis, which begins with a larger proportion and then reduces its contribution, rendering it responsible for 62% of the waste.

Gerbig stressed that his estimates were conservative with respect to the degree of the town's involvement, and any responsibility that was not allocated to the town went to plaintiff. He also assumed that the town did not contribute any waste to the landfill after 1969, until it closed in 1972. Moreover, he used the available data figures that assumed the maximum total volume of waste in the landfill, which served to reduce the town's percentage of the waste it contained, and he relied on the larger of the available figures for the total area of the landfill, thereby reducing the town's percentage share of its waste. He also assigned responsibility to plaintiff for all other waste contributors to lot 28, including William, MSLA, and other defunct or insolvent entities that he labeled "orphan shares."

A-0309-19

Gerbig explained town waste was on lot 28, even if the town did not deposit the waste on that lot. Under a typical allocation, an "owner, operator, transporter [and] generator" all own responsibility for their waste "from cradle to grave," wherever it ends up being located. In his opinion, the town's waste was on lot 28 based on his assessment of historic aerial maps that demonstrated the landfill's top layer physically advanced over the period that the town deposited the waste and, eventually, completely covered lot 28. He opined that the landfill was highest in areas outside lot 28, such that leachate ran under and across plaintiff's property. The record also reflected that lot 28 was near the entrance of the landfill, where the town's waste-depositing trucks would enter, and that there were no signs or property demarcations that delineated what property constituted lot 28.

Gerbig analyzed the "distinguishability" of waste throughout the landfill and found that waste on lot 28 was not distinguishable from that on the rest of the landfill. That being so, because the town deposited waste on the rest of the landfill, it must also have deposited waste on lot 28. An exception was the oil-laden soil on lot 28, which cost NJMC $94,538 to remediate. Gerbig analyzed the "chemical distinguishability" of different samples of waste throughout the landfill and determined that they could typically be found in any municipal solid

11

waste stream. He opined that 99.3% of the chemical concentrations in the landfill were within the normal range, such that no parties that dumped waste there served as "drivers" of contaminants to the remainder of the landfill or engaged in activity that required abnormal remediation measures. Accordingly, the quantitative portion of the allocation simply involved a proportional analysis with regard to the volume of waste the town generated vis-à-vis other sources of refuse on lot 28.

Gerbig then identified seven qualitative factors that tilted to the allocation of responsibility for the town, and two that tilted to plaintiff. He opined the town was responsible for arranging the disposal of waste by others, receiving financial benefits from this arrangement and operating the landfill, and that it failed to cooperate and contribute with other agencies in clean-up and remediation requests. Free waste disposal was a benefit for the town, which Gerbig estimated saved it between $5 million and $7.4 million. Moreover, the town benefited from being a more attractive place for commercial and industrial businesses to locate because of the free waste disposal. As for plaintiff, he indirectly benefited from forgoing the expense of closing the landfill by placing a landfill cover over his lot. Gerbig assigned the qualitative factors equal weight

12

and offset those benefiting plaintiff from those benefiting the town to arrive at an "escalation factor" of 1.56.

Gerbig concluded that the town was responsible for between 42% and 62% of the waste in the landfill. The midpoint of the town's share of the waste, multiplied by the escalation factor, resulted in an allocation to the town of $730,000 of the $902,167.31 in stipulated damages.

Dr. Vatsal Shah, an expert in civil engineering and landfills, testified for the town. He opined that Gerbig's reports "lacked the factual evidence and data required" to estimate the town's range of liability for the waste on lot 28, as there was insufficient data to form such an opinion. Similarly, Shah posited there was a lack of data to demonstrate that the town's waste was spread across the entire site. Also, he noted that Gerbig analyzed municipal solid waste leachate trends, despite acknowledging that the majority of the waste was industrial.

Shah testified that the evidence did not demonstrate whether the town deposited waste on lot 28 because the fact that a landfill grew over time did not militate such a finding. In Shah's opinion, Gerbig's determination of the town's responsibility for waste on lot 28 was unreliable because it depended on numerous assumptions instead of actual data.

13

Finally, Shah testified that leachate flowed from lot 28 to surrounding properties, including the remainder of the landfill. On cross-examination, however, he conceded that there was likely surface water runoff that affected lot 28 and originated on the town-owned portion of the landfill. He opined there was insufficient data for Gerbig to conclude that any of the town's waste impacted lot 28. The only available data, Shah testified—including the lease agreement between the town and William—suggested that the town did not deposit waste there, because at least thirteen other municipalities deposited waste in the landfill, and there was no way to distinguish whether the municipal solid waste on lot 28 came from the town or one of the other municipalities. Shah asked the court to reject the qualitative factors Gerbig utilized because they were only intended to allocate cost for CERCLA superfund sites and that Gerbig's escalation factor was unreliable and subjective.

To reach a decision, the court considered N.J.S.A. 13:1E-103, part of the Closure Act, which states that "[e]very owner or operator of a sanitary landfill facility shall be jointly and severally liable for the proper operation and closure of the facility . . . ." It adopted the definition of "operator" in New Jersey Department of Environmental Protection v. Gloucester Environmental Management Services, 800 F. Supp. 1210, 1215 (D.N.J. 1992), which held that

an individual is "considered an operator under the 'usual meanings' of the term," such that he or she "shows a high degree of personal involvement in the operation and decision-making process of the business." The court found that the town was potentially liable under the statute because it owned a substantial portion of the landfill and was closely involved in decision-making.

The court denied the town's motion to bar the Roux reports and Gerbig's testimony as inadmissible net opinions by rejecting the town's argument that plaintiff had the burden to prove what waste the town deposited on lot 28. The court noted that plaintiff was assessed damages under the Closure Act in clean-up costs for lot 28's proportion of the entire landfill and held that it would assess damages by the town to plaintiff under "a similar proportional analysis." The court also denied the town's motion to limit its potential damages to $190,531.89. The court disagreed because this figure was "derived from the [f]inal [j]udgment of July 5, 2011, which was ultimately amended by the [April 19, 2013 Appellate Division decision.]"[7]

Ultimately, the court found Gerbig "extremely credible" and accepted both of his allocation methods, which resulted in either a 42% or 62% allocation of waste to the town. It further found that Gerbig's conclusion that contaminants

---

[7] NJMC, No. A-6090-10 (slip op. at 1).

A-0309-19

in the landfill were typical of those in any municipal solid waste stream was scientifically reliable and demonstrated that lot 28 was not "dirtier"—and, therefore, more expensive to remediate—than the rest of the landfill. As such, it was appropriate to assess the town's contribution to the waste on lot 28 in proportion to its contribution to the waste in the entire landfill.

Addressing Shah's opinion that plaintiff could not prove with specificity what waste was deposited on lot 28, the court found it irrelevant under a proportionality methodology, because the issue was not what waste was on lot 28 but whether the town's waste was present. The court accepted that the town's waste was present.

The court rejected Gerbig's analysis of qualitative factors and his escalation factor. It noted that the factors he utilized were economic in nature, but they were not monetized, and it was unclear why he assigned them all equal weight. It found that Gerbig's portrayal of plaintiff "as an innocent, passive victim," was inaccurate because he failed to address the numerous environmental problems on lot 28.

Because lot 28 had soil contaminated with oil, a unique characteristic distinguishable from clean-up costs required for the remainder of the landfill, the court subtracted $94,538 from the stipulated damages, reducing plaintiff's

16

potential allocation to the town to $807,629. It then attributed 52% of waste to the town and awarded plaintiff $419,967. This appeal followed.

## II.

When we review a trial court's final determination in a non-jury matter, we do "not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]" Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (alteration in original) (quotation omitted). The trial judge's findings are "binding on appeal when supported by adequate, substantial, credible evidence. Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (internal citation omitted) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). We defer to the trial court's credibility determinations "because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412). We review a trial court's conclusions of law de novo. Little v. KIA Motors Am., Inc., 425 N.J.

A-0309-19

Super. 82, 90 (App. Div. 2012) (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

On appeal, the town argues that the court erred by failing to dismiss with prejudice plaintiff's complaint at the end of trial because there was no evidence that it deposited waste onto lot 28. It contends plaintiff could not meet his burden as the Closure Act requires that he demonstrate that the town proximately caused his damages. We disagree.

The Legislature passed the Closure Act in 1982 in order to avoid the significant public health and safety consequences that can result from improper closure or operation of sanitary landfill facilities. In re Adoption of N.J.A.C. 7:1I, 149 N.J. 119, 125-26 (1997). It created the "Sanitary Landfill Facility Contingency Fund," administered by the Environmental Claims Administration, "as a nonlapsing, revolving fund in the Department of Environmental Protection . . . . [The fund is] credited with all tax revenues collected by the [Division of Taxation] pursuant to section 5 [of the Closure Act]." Id. at 126 (first alteration in original) (quoting N.J.S.A. 13:1E-105).

N.J.S.A. 13:1E-103 states: "[e]very owner or operator of a sanitary landfill facility shall be jointly and severally liable for the proper operation and closure

of the facility, as required by law, and for any damages, no matter by whom sustained, proximately resulting from the operations or closure."

N.J.S.A. 13:1E-106(a) provides:

> The fund shall be strictly liable for all direct and indirect damages, no matter by whom sustained, proximately resulting from the operations or closure of any sanitary landfill. These damages shall include, but not be limited to:
>
> (1) The cost of restoring, repairing or replacing any real or personal property damaged or destroyed;
>
> (2) The cost of restoration and replacement, where possible, of any natural resource damaged or destroyed, including any potable water supply;
>
> (3) The cost of any personal injuries, including medical expenses incurred and income lost as a result thereof; and
>
> (4) The costs of the design, construction, installation, operation and maintenance of any device or action deemed necessary by the department to clean up, remedy, mitigate, monitor or analyze any threat to the public health, safety or welfare of the citizens of this State, including the installation and maintenance of methane gas monitors and vents and leachate monitoring wells and collection systems, and the sampling and analysis of any public or private potable water supply.

The Court has defined proximate cause as "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces

A-0309-19

the result complained of and without which the result would not have occurred." Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Conklin v. Hannoch Weisman, 145 N.J. 395, 418 (1996)).

Here, the evidence supported the court's findings and conclusions. Under N.J.S.A. 13:1E-103, it is clear that the town is jointly and severally liable for the landfill's closure, so long as it is either an owner or operator. Based on the history, the town both owned and operated the landfill.

The town also is liable under the Closure Act for damages either plaintiff or NJSEA sustained. The parties' dispute over whether the waste was on lot 28, either deposited onto the lot or naturally making its way there, pertains to whether the town proximately caused the damages. The record contains sufficient evidence for the court's finding that the town's actions were the proximate cause of the damages.

We agree with the court's conclusion that plaintiff's inability to prove the exact types and amounts of waste on his property is not fatal to his claim. The court found credible Gerbig's testimony regarding the "'proportionality' formula to assess [the town's] contribution to waste at [l]ot 28 as it relates to its waste contribution to the entirety of the . . . landfill." To do otherwise would be to ignore the history of the property.

20

Gerbig testified that the town's waste was on lot 28 either through direct dumping that enlarged the area or through leachate that ran across and under lot 28. The court credited Gerbig's testimony that the composition of the waste on lot 28, as compared to that on the remainder of the landfill, rendered the proportionality method appropriate. It then adopted this method, which it modified by excluding the cost to remediate the oil-laden soil and by rejecting Gerbig's qualitative factors. The record contains substantial credible evidence for these findings.

## III.

We similarly reject the town's argument that the court erred by finding it was liable when it was a passive owner of the landfill. The town argues that it was merely a passive owner of the landfill, whereas plaintiff and his father were responsible for the day-to-day operations. It also argues that because case law pertaining to the Spill Act, including New Jersey Department of Environmental Protection v. Dimant, 212 N.J. 153 (2012), moved away from strict liability in the environmental contamination field, the court should not impose such a concept under the Closure Act. We disagree.

It is abundantly clear from the record that the town owned the landfill during its operation and qualified as an operator because the town exercised

control over it, was involved in decision-making pertaining to it, and benefited financially from it. Notably, neither the Closure Act nor case law distinguish between "active" and "passive" owners.

N.J.S.A. 13:1E-103 provides for joint and several liability for the improper operation and closure for "[e]very owner or operator" of sanitary landfills. N.J.S.A. 13:1E-102(b) defines "owner or operator" as "in addition to the usual meanings thereof, every owner of record of any interest in land whereon a sanitary landfill facility is or has been located, and any person or corporation which owns a majority interest in any other corporation which is the owner or operator of any sanitary landfill facility."

The record demonstrates that the town owned the vast majority of the landfill during its operation and exercised control over it. The town arranged for residents and businesses to dispose of waste there, issued dumping permits and licenses for disposal, and entered into lease agreements for the landfill. The record establishes that lot 28 was within the landfill's borders. Moreover, N.J.S.A. 13:1E-103 provides for joint and several liability for each owner "of a sanitary landfill facility" and does not require the town to own every individual parcel of land within the facility.

Also, the town was an operator of the landfill, including lot 28. Between 1952 and 1958, the town received all of its waste and deposited it in the landfill. The town continued to deposit the waste into the landfill until at least 1968. The town received applications from local businesses for dumping permits and licenses from private contractors and industrial firms for dumping licenses, for which it charged a fee.

While this waste depositing and dumping did not explicitly apply to lot 28, the court found that these activities affected that lot because the town's waste was on it. As noted, the town did not include demarcations that delineated lot 28's boundaries or install signs to direct its own truck drivers and other businesses or individuals to avoid depositing waste on plaintiff's lot.

IV.

The town's argument regarding the Spill Act is equally unavailing. N.J.S.A. 13:1E-103 specifically provides for joint and several liability, and no case law holds otherwise. We found plaintiff jointly and severally liable in NJMC's suit against him, NJMC, No. A-6090-10 (slip op. at 21), so the town would be similarly liable in his suit for contribution pursuant to the same statute.

The town also argues that plaintiff's claims for contribution are barred because NJMC released it from liability. It contends that the Joint Tortfeasors

23

A-0309-19

Contribution Law, N.J.S.A. 2A:53A-1 to -48, only allows for contribution where two or more entities are liable in tort to the same entity, and that it is not liable to NJMC and NJSEA because of the release.[8]  However, the trial court found that NJMC did not release the town from liability.  The town primarily relies on the paragraph 27C release from the lease to assert that plaintiff's contribution claims are barred.  However, this release applied to "[d]emised [p]remises" that did not include lot 28, which it referred to as either the "[r]etained [p]roperties" or "[r]etained [p]remises."  The release, therefore, is inapplicable.

V.

Addressing the remedy crafted by the court, the town argues that because another court entered judgment in favor of NJMC for $711,635.42 solely to avoid unjust enrichment and plaintiff settled with NJMC and NJSEA for $902,167.31, the difference ($190,531.89) represents plaintiff's liability under

___

[8]  In Keegan v. Town of Kearny, No. A-1162-16 (App. Div. July 26, 2018) (slip op. at 5-6)—in which plaintiff was not a party and we addressed a third-party complaint the town filed against the NJSEA—the town cited the same provisions of its 2005 lease with NJMC (the prefatory clause, paragraph 4B and paragraph 11) before the trial court that ruled on the summary judgment motions.  The trial court dismissed the third-party complaint because none of the three provisions met the requirements for indemnification contracts.  Id. at 4.  We affirmed that ruling, as well as the trial court's dismissal of the town's contribution claims, because NJSEA was not partially liable to that plaintiff.  Id. at 4; 7-8.  As such, we held that NJMC did not indemnify the town against any claims.

the Closure Act. The town contends that the court erred in declining to cap its potential liability at $190,531.89 because this served to allocate to it part of the unjust enrichment award. We reject this argument as well.

Under N.J.S.A. 13:1E-103, owners and operators of landfills are jointly and severally liable "for any damages" resulting from their operations or closure. Similarly, N.J.S.A. 13:1E-106(a) holds the Sanitary Landfill Contingency Fund strictly liable "for all direct and indirect damages" and sets forth a non-inclusive list of damages. Thus, the Closure Act does not limit, or even specify, the damages to which it applies. Although plaintiff agreed to pay $902,167.31 for the landfill's remediation and closure, N.J.S.A. 13:1E-103 does not differentiate between "damages" a party sustained and liability by virtue of a party simply being an owner or operator of a landfill. Parties are liable in either case. The court fashioned an equitable remedy primarily based on the town's proportion of the responsibility to remediate and close lot 28.

We review the trial court's remedy under an abuse of discretion standard. Sears Mortg. Corp. v. Rose, 134 N.J. 326, 354 (1993); Pressler & Verniero, Current N.J. Court Rules, cmt. 4.9 on R. 2:10-2 (2021). We found none here. We discern no error in the adoption of the proportionality analysis to assess the

town's share of responsibility after making detailed findings, based on Gerbig's testimony.

## VI.

Finally, the town argues that plaintiff's claims are barred by the entire controversy doctrine. It contends that plaintiff was aware of potential claims against the town but decided to forgo them in the cost recovery action against him. It asserts that an uncontroverted certification submitted as part of the town's motion to dismiss plaintiff's complaint established that since NJMC began operations at the landfill in 2009, the changes in site conditions made it virtually impossible to determine the conditions that existed before that time. The town also asserts that the complaint should have been dismissed because plaintiff failed to comply with the notice requirements of Rule 4:5-1(b)(2), which would have allowed it to decide whether it wished to participate in the litigation before the site conditions permanently changed. We reject these arguments as well.

Rule 4:30(A) provides: "[n]on-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine . . . ."

Rule 4:5-1(b)(2) states, in relevant part:

> [E]ach party shall disclose in the certification the names of any non-party who should be joined in the action pursuant to R. 4:28 or who is subject to joinder pursuant to R. 4:29-1(b) because of potential liability to any party on the basis of the same transactional facts. Each party shall have a continuing obligation during the course of the litigation to file and serve on all other parties and with the court an amended certification if there is a change in the facts stated in the original certification. . . . If a party fails to comply with its obligations under this rule, the court may impose an appropriate sanction including dismissal of a successive action against a party whose existence was not disclosed or the imposition on the noncomplying party of litigation expenses that could have been avoided by compliance with this rule.

The two rules are intertwined in that the standard for the court to dismiss an action pursuant to Rule 4:5-1(b)(2) is the same as that for it to dismiss an action for non-joinder of a party required by the entire controversy doctrine. The party that invokes the doctrine based on its non-joinder in the first action "has the burden of establishing both inexcusable conduct and substantial prejudice." Hobart Bros. v. Nat'l Union Fire Ins. Co., 354 N.J. Super. 229, 242 (App. Div. 2002). "The purpose of [Rule 4:5-1(b)(2)] is to implement the philosophy of the entire controversy doctrine," Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 4:5-1(b)(2), and "[t]he court may . . . dismiss a successive suit against an unnamed transactionally interested [party] only if the

failure to name that [party] was inexcusable and that [party's] ability to defend the successive action is substantially prejudiced by not having been named." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:30(A). Further,

> The entire controversy doctrine embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy. Our Supreme Court has previously explained that the purposes of the entire controversy doctrine are threefold: (1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay.
>
> [Adelman v. BSI Fin. Servs., Inc., 453 N.J. Super. 31, 39 (App. Div. 2018) (citations and quotations omitted).]

In Hobart Brothers, 354 N.J. Super. at 242-44, we clarified that recent amendments to Rule 4:30(A) restricted it to non-joinder of claims as opposed to non-joinder of parties. The court set forth a non-exhaustive list for courts to consider in analyzing whether the moving party demonstrated inexcusable conduct and substantial prejudice, including whether the moving party was precluded from asserting a claim, whether that party could be compensated by other means, the extent to which judicial resources were utilized in the prior

suits, whether the actions of the party that failed to join were reasonable in light of all circumstances, and whether that party failed to join the moving party as part of a litigation strategy designed to thwart the moving party's ability to assert a claim. Id. at 243-44. The court recognized that "preclusion is a remedy of last resort." Id. at 244 (quoting Vision Mortg. Corp. v. Chiapperini, 156 N.J. 580, 584 (1999)).

Here, the record supports the motion court's rejection of the town's argument. Plaintiff's decision to decline to join the town was not so unreasonable as to constitute inexcusable conduct. The court accepted his representation that he did not believe he was liable to NJMC, and nothing in the record before the motion court suggested otherwise. Indeed, our prior decision noted that plaintiff testified at the trial that he was not aware of how the landfill was operated or closed, and that he was unaware of contamination and environmental problems on lot 28 until years after operations at the landfill ceased. NJMC, No. A-6090-10 (slip op. at 10-11). Nothing in the record suggests that plaintiff declined to attempt to join the town as part of a litigation strategy, such as an attempt to thwart the town's ability to assert a claim. Under Hobart Brothers, the town bears the burden of demonstrating both inexcusable

conduct and substantial prejudice; because it did not meet its burden as to the former, the court appropriately denied the motion.

The town's additional arguments are without sufficient merit to warrant discussion in a written opinion.  <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0309-19